Melvin Clark and Jessie Clark v. Commissioner.
Clark v. Commissioner
Docket No. 37805.
United States Tax Court
T.C. Memo 1955-252; 1955 Tax Ct. Memo LEXIS 86; 14 T.C.M. (CCH) 1006; T.C.M. (RIA) 55252; September 7, 1955
*86 Issue 1, Under all of the circumstances of this case and upon the entire record, it is held that the Commissioner was not justified in reconstructing the taxable net income of the petitioner for each of the taxable years at an amount equal to 25 per cent of gross receipts from bettors. Issue 2. Held, that there are no tax deficiencies to which 50 per cent penalties under section 293(b), 1939 Code, attach. Issue 3. Held, that the petitioners are liable for additions to the tax under sections 294(d)(1)(A) and 294(d)(2), 1939 Code, the amounts of which are to be recomputed under Rule 50. Sol Goodman, Esq., 1016 Union Trust Building, Cincinnati, Ohio, for the petitioners. Robert E. Johnson, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax and 50 per cent additions thereto under section 293(b) of the 1939 Code as are set forth in the following schedule. By amended answer, the Commissioner has made claim for additions to the tax under sections 294(d)(1)(A) and 294(d)(2) of the 1939 Code, as are shown below. Year
Deficiency
Sec. 293(b)
Sec. 294(d)
1948
$ 30,058.94
$15,029.47
$ 4,925.77
1949
44,093.84
22,046.92
7,055.01
1950
41,933.54
20,966.77
6,937.05
Total
$116,086.32
$58,043.16
$18,917.83
*87 The respondent determined that petitioners omitted from the income reported as derived from the operation of a business each year the following amounts: 1948
$ 69,459.41
1949
97,617.92
1950
84,109.04
$251,186.37
The questions to be decided are as follows: (1) Was the Commissioner justified in ignoring the profits or losses shown for each year in the accounting records maintained by the petitioner, and in reconstructing net income on the basis of 25 per cent of gross receipts, the percentage being determined by the Commissioner? (2) Does the evidence establish that the petitioner, Melvin Clark, understated his taxable income in any of the years involved? (3) If there is any deficiency, was any part due to fraud with intent to evade tax? (4) Are the petitioners liable for the 10 and 6 per cent additions to tax prescribed in sections 294(d)(1)(A) and 294(d)(2), 1939 Code? Findings of Fact Melvin and Jessie Clark are husband and wife, residing in Cincinnati, Ohio. They filed joint returns for the taxable years with the collector for the first district of Ohio. They did not make or file any declarations of estimated tax or pay any installment of estimated *88 tax for any of the taxable years. Since the issues to be decided relate solely to Melvin Clark, he is referred to hereinafter as the petitioner. The petitioner acquired control of a "numbers" business in the latter part of February 1948, and was engaged in this business during the taxable years. He operated his business from a building in Newport, Kentucky, although a large percentage of his receipts came from bettors in nearby Cincinnati, Ohio. At various times prior to February 1948, the petitioner also had been associated with the numbers business. The numbers business operated by the petitioner during the taxable years involved wagering transactions wherein bettors would select a three digit number ranging from 000 to 999 and make the wager that the selected number would appear in the printed daily statistics representing certain aspects of stock transactions on the New York Stock Exchange and bond transactions on the New York market. Persons who played the numbers gave their selections and bets to a writer. The wagers, money, accepted by petitioner usually ranged in size from one cent to $1. The writers entered the numbers selected on slips, which they turned over to pick-up *89 men or runners, who in turn brought the slips to petitioner's office in Newport. When the writers turned over their slips to the runners, they would also turn over a sum of money equal to 70 or 75 per cent of the wagers they had collected, and they retained the balance of the money wagered, 30 or 25 per cent, as their compensation. The runners in turn retained an additional amount, 5 per cent of original wagers, when they brought the slips and money to petitioner's offices in Newport. During the taxable years, the petitioner usually paid odds of 550 to 1 in the case of wagers on which he received 70 per cent of the wager (i.e., wagers from which the writer and pick-up man retained a total of 30 per cent), and odds of 500 to 1 in the event he received 65 per cent of the bet. The business operations at the Newport building were carried on substantially as follows: The runners turned in the slips on which the bettor's selection of a number was written, and money wagered by bettors each day before the close of transactions on the bond market and the stock exchange, from which the winning numbers were determined. The deadline for the runners ranged from 1:30 p.m. to 3:00 p.m. The money *90 usually was turned over to petitioner's cashier, Moses Hudson, who counted and wrapped the money and gave petitioner a tally showing the total amount turned in by each runner. The runners turned in their number slips to petitioner's office girls who totalled the amounts of the bets shown on each runner's slips, deducted the writers' and runners' commissions, and computed the amounts of cash due from each runner. The tallies and the numbers slips also were turned over to petitioner and checked by him against the amounts which Hudson received. Two winning numbers were established each day, one from stock market transactions and one from bond transactions. When the winning numbers were determined, the petitioner located the slips with the winning numbers and compiled a list showing the total amounts of payouts due each runner on the winning numbers. The petitioner paid the runners the amounts due them on winning tickets from the cash which had been taken in that day. If the cash on hand was insufficient he would cash a check to obtain additional funds. The accounting records of each day's business were kept in the following way. Each day the petitioner made a total on an adding machine *91 of his gross receipts from runners, and of the amounts paid to runners on winning numbers. He used 11 column sheets of yellow accounting paper for his accounting record. In this accounting record he entered the adding machine total of each day's gross receipts from runners, and the adding machine total of the payouts to runners on winning numbers. The amount of the difference between total receipts from runners and total payouts to runners was entered in the accounting record each day as the petitioner's gain or loss for the day. No record was kept in petitioner's books of the specific amounts which were paid to runners. The following schedule illustrates the nature of the daily accounting record which petitioner maintained and which was examined by the Commissioner's agent. The terms "income" and "disbursement" mean total receipts from runners and total payments to runners, respectively. The following schedule is an excerpt from the accounting records for the taxable years which the petitioner maintained and retained. "December 1950
Bond
Stock
Market
Market
Winnings
"Date
Day
Number
Number
'Income'
Disbursements
or Losses
1
Friday
631
743
$1,345.20
$ 795.50
$ 549.70
2
Saturday
559
816
1,297.04
3,226.00
(1,928.96)
4
Monday
973
157
1,524.82
1,281.00
253.82
5
Tuesday
621
464
1,330.43
882.50
447.93
6
Wednesday
575
111
1,362.58
3,254.00
(1,891.42)
7
Thursday
257
146
1,426.33
849.75
576.58
8
Friday
339
193
1,538.50
1,028.50
510.00
9
Saturday
638
445
1,440.01
924.00
516.01"
*92 The petitioner entered, also, in the accounting record his expenditures for his various expenses such as rent, gas, electricity, supplies, and miscellaneous items. The petitioner did not retain either the runners' wagers slips or the adding machine tapes. It is unlawful in Kentucky and Ohio to operate a numbers betting business. The petitioner destroyed the runners' betting slips after the expiration of 3 days in order to destroy evidence of his unlawful business which would be harmful to him in the event of a police raid. The slips were retained for 3 days for the purpose of establishing claims of bettors. Petitioner required that claims be made within 3 days after the day of a bet. At the end of each of the taxable years, petitioner gave his accounting records to a public accountant who added the daily totals to determine monthly totals, prepared a worksheet from the monthly totals, and prepared petitioner's income tax returns from his worksheet and petitioner's accounting records. Petitioner listed his occupation on his returns for the taxable years as "lottery operator." In Schedule C of his returns, "Profit (or loss) from business or profession", petitioner reported total *93 receipts, "hits" (payouts on winning bets), deductions, and net profit, in the following total amounts: 1948
1949
1950
Total receipts
$302,397.69
$389,422.68
$375,687.48
Hits
286,480.21
378,183.54
355,800.88 *
Other deductions
9,777.47
11,501.39
10,073.77
Total deductions
296,257.68
389,684.93
365,874.65
Net profit
$ 6,140.01
$ (262.25)
$ 9,812.83
There are no discrepancies between the figures in the petitioner's records for "income," "disbursements," and "win or lose," and those appearing in petitioner's tax returns. Petitioner's return for 1950 contained the following explanation for the deduction for hits: "Hits: classified and defined as Winning Numbers, calling for payments, made." A similar explanation appears in the return for 1948. The petitioner reported business income or loss in each of the taxable years, and the respondent increased petitioner's business income, in the amounts shown below: Total
Profit
business
(or loss)
profit
reported
Increase
determined
by
made by
by
Year
petitioner
respondent
respondent
1948
$ 6,140.01
$ 69,459.41
$ 75,599.42
1949
(262.25)
97,617.92
97,355.67
1950
9,812.83
84,109.04
93,921.87
Totals
$15,690.59
$251,186.37
$266,876.96
*94 In the deficiency notice, the explanation given by the respondent for his increase in petitioner's net taxable income for 1948 is as follows: "You failed to report additional income from operation of business amounting to $69,459.41. The above adjustments [are] made in accordance with field investigation." Similar explanations were made for the adjustments to income determined for 1949 and 1950. The respondent did not base his determinations of the amounts of allegedly unreported income upon the use of the annual increase in net worth plus expenditures method of determining taxable income; or upon the bank deposit plus cash expenditures method; or upon the existence of any assets concealed by the petitioner; or upon any specific evidence of unreported income. The amount of purported unreported business income were determined by the respondent's agent in the following way: The agent accepted the amounts of gross receipts as shown on the petitioner's returns. He applied 75 per cent to total receipts for each year and determined that the result represented the sum of petitioner's expenses plus amounts paid out to winning bettors, i.e., "hits"; and he treated 25 per cent of gross *95 receipts for each year as petitioner's net profit from the operation of the numbers business. On this basis, the agent determined that petitioner realized net income in excess of the amount reported in each year to the extent of $69,459.41 in 1948; $97,617.92 in 1949; and $84,109.04 in 1950. The following schedule summarizes the computations made by respondent's agent to determine the purported understatements of petitioner's business income in each of the taxable years: 1948
1949
1950
Receipts per return
$302,397.69
$389,422.68
$375,687.48
Less 75% allowance for hits and expenses
226,798.27
292,067.01
281,765.61
Net income from numbers business per respondent
75,599.42
97,355.67
93,921.87
Net income from numbers business per return
6,140.01
(262.25)
9,812.83
Understatement in numbers business income determined by
respondent
$ 69,459.41
$ 97,617.92
$ 84,109.04
The revenue agent who investigated petitioner's returns for the taxable years visited petitioner's place of business and observed the method of operations. Petitioner submitted net worth statements to the revenue agent at the latter's request. Petitioner did not realize net income *96 from his business in 1948 and 1950 in any amount in excess of $6,140.01 and $9,812.83, respectively; and he operated his business at a loss in 1949. Petitioner's failure to file timely a declaration of estimated tax for 1948 and 1950 was due to willful neglect and not to reasonable cause. Opinion HARRON, Judge: Issue 1. The principal issue is whether the Commissioner was warranted in ignoring the profits or losses shown in petitioner's accounting records and in determining that petitioner realized net income for each year from his business in an amount equal to 25 per cent of the gross receipts of the business. The Commissioner argues that because the runners' wager slips were destroyed, petitioner's accounting records were inadequate. The Commissioner's agent in his investigation of petitioner's returns for the taxable years, developed his own theory that 25 per cent of the gross receipts for each year, as shown by petitioner's books, represented petitioner's actual net income from the business each year, and that 75 per cent represented the payouts plus a small amount of expenses. The agent's theory is explained hereinafter. The Commissioner advances a second reason for *97 his having ignored petitioner's accounting records. He contends that the accounting records from which the income tax returns were prepared contained inflated figures for payouts. The burden was upon the petitioner to prove that the Commissioner's determinations were in error. We have carefully considered the argument that the figures for total, daily payouts in petitioner's books were padded, or inflated. In this aspect of the issue, the respondent relies upon the testimony of a pick-up man, who was associated with the petitioner at one time, who testified that the petitioner kept two different sets of accounting records, in one of which the amounts of payouts were inflated. This witness testified that one set of records, allegedly the correct one, was on yellow paper, and that the alleged second or false set of records was on white paper. The implication in his testimony is that the returns of the petitioner were prepared from the alleged inflated records allegedly kept on white paper. This witness did not testify categorically that any figure in the records which the agent examined, from which petitioner's returns were prepared, was wrong. The testimony of this witness was denied *98 by petitioner, and it was not corroborated by another witness called by the respondent. We are unable to accept the testimony of the pick-up man as credible. Witnesses were excluded from the courtroom during the trial, and the witness in question did not hear other testimony which preceded his testimony. There are conflicts between the testimony of the pick-up man and other evidence. His testimony is not convincing and we are unable to give it the weight which the respondent contends should be given. We turn to the problem of whether the Commissioner was justified in disregarding petitioner's accounting records of his payouts. It is true that petitioner did not retain the wagers slips of the runners. On this point it is appropriate to make the same observation as was made in : "True, petitioner had destroyed the * * * [original betting slips] and thus has made the Commissioner's task of auditing the returns immeasurably more difficult than it should be. This is conduct that is not to be condoned. Perhaps the Treasury should seek and the Congress should provide it with appropriate and effective sanctions, civil or criminal or both, *99 against taxpayers who fail to keep or who do away with important records bearing on their liability. But, under the law as it now stands we are not empowered to approve deficiencies merely because records have been destroyed. Of course, the destruction of records is a factor that may be taken into account in various circumstances such as the determination of fraud, and it may justify the Commissioner in using some reasonable method of reconstructing a taxpayer's income, with the burden upon the taxpayer to show that the Commissioner is in error. * * *" On the entire record in this case, it is concluded that the Commissioner's method of reconstructing petitioner's net income for the taxable years was wholly arbitrary as applied to this case, and that the petitioner has discharged his burden of proof. The respondent's agent developed an arithmetical theory that in the operation of petitioner's business he must have paid to winning bettors each year about 75 per cent of his gross receipts from runners, a portion of the 75 per cent going to defray relatively small expenses. If this theory were accurate and reliable, it would follow that petitioner's profit from his business would equal *100 25 per cent of gross receipts. Careful consideration has been given to the theory of and to the method adopted by the agent. The theory presupposes that only 1 of each 1,000 wagers will be a winning wager because only 1 of the 1,000 possible numbers could be the winning number. Opposed to the theory of the respondent's agent is unrefuted testimony of the petitioner about the operation of his business during the taxable years. His testimony is to the effect that the wagers accepted by petitioner's runners were not evenly spread among the entire 1,000 possible numbers; that it was a frequent occurrence for a good many bettors to select the same combination of numbers, and for such combination to be the winning number; and that when a good many bettors selected the same winning number his losses were very heavy. The petitioner testified, further, that on several occasions during the taxable years he lost all of his capital and had to arrange with winning bettors to wait for payments on their bets. There is no evidence to refute petitioner's testimony. Taking into account the entire record, the nature of petitioner's business, and the arbitrary character of the respondent's determinations, *101 we must conclude that respondent's determinations of taxable income cannot be sustained. Conceivably, a different result might be reached on a different record. It follows that there are no tax deficiencies. Issue 2: The 50 per cent penalties under section 293(b) of the 1939 Code fall with the deficiencies. It is noted, however, that the respondent has failed to prove by clear and convincing evidence that petitioner had a fraudulent intent to evade tax. Issue 3: By amended answer, the respondent made claim for additions to tax under sections 294(d)(1)(A) and 294(d)(2) of the 1939 Code. The amount of these additions is based on petitioner's actual tax liability, and does not depend upon the existence of a deficiency in tax. Although the petitioner filed no reply controverting the allegations of respondent's amended answer, respondent has not moved the Court to order that the undenied allegations be deemed admitted. See Rule 18 of the Court's Rules. Accordingly, the allegations contained in respondent's amended answer are deemed denied. We have found as a fact that the petitioner failed to file declarations of estimated tax in any of the taxable years. The additions to tax under *102 section 294(d)(1)(A) for failure to file timely declarations of estimated tax apply unless the failure was due to reasonable cause and not due to willful neglect. ; , affirmed . On the basis of the entire record, we have found that the petitioner's failure to file timely declarations was due to willful neglect and not due to reasonable cause. The addition to tax under section 294(d)(2) for substantial underestimate of estimated tax applies if 80 per cent of the taxpayer's tax liability exceeds the estimated tax paid, whether or not the underestimate was due to reasonable cause. . The respondent's determinations that petitioner is liable for additions to tax under sections 294(d)(1)(A) and 294(d)(2) of the 1939 Code for 1948 and 1950 are approved; no tax is due for 1949. However, because of the holding under the first issue, the amounts of the penalties for 1948 and 1950 must be recomputed. This shall be done under Rule 50. Decision will be entered under Rule 50. Footnotes
*. The correct figure is $355,800.88. The return shows $355,800.85. The error of 3 cents is a typographical error.↩